1  GARRICK A. HOLLANDER – State Bar No. 166316
ghollander@wghlawyers.com

2  **WINTHROP GOLUBOW HOLLANDER, LLP**

3  1301 Dove Street, Suite 500
Newport Beach, CA 92660

4  Telephone:   (949) 720-4100
Facsimile:    (949) 720-4111

5

6  General Insolvency Counsel for Global Premier Regency
Palms, Oxnard, L.P., Debtor and Debtor-in-Possession

7

8

9  ## UNITED STATES BANKRUPTCY COURT

10  ## CENTRAL DISTRICT OF CALIFORNIA

11  ## NORTHERN DIVISION

12

13  In re

14

15  GLOBAL PREMIER REGENCY PALMS
OXNARD, LP, a California limited
partnership

16

17        Debtor and
      Debtor-in-Possession.

18

Case No. 9:25-bk-10329-RC

Chapter 11 Proceeding

**DEBTOR'S MOTION FOR ORDER AUTHORIZING DEBTOR TO ENTER INTO REAL PROPERTY LEASE AMENDMENT WITH TENANT; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATIONS OF CHRISTINE HANNA AND KEVIN ROY IN SUPPORT THEREOF**

19  DATE:      July 15, 2025
20  TIME:       9:00 a.m.
PLACE: [1]   Courtroom 201
21              1415 State Street
            Santa Barbara, CA  93101-2511

22

23      **TO THE HONORABLE RONALD CLIFFORD, III, UNITED STATES BANKRUPTCY**

24  **JUDGE, AND TO CREDITORS:**

25      PLEASE TAKE NOTICE that at the above stated date and time, Global Premier Regency

26  Palms Oxnard, LP, a California limited partnership and debtor and debtor-in-possession in the above-

27  captioned Chapter 11 proceeding (the "Debtor"), will move for approval of, and hereby submits, this

28

[1] The hearing on the Motion is scheduled to be heard via Zoom.  Please check the Court's calendar just prior to the hearing to confirm. http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/.

*Motion for Order Authorizing Debtor to Enter into Real Property Lease Amendment with Tenant* ("Motion"). By this Motion, the Debtor seeks an order authorizing the Debtor to enter into an amendment to the lease in a form substantially similar to **Exhibit 2** (the "Amendment") of the Debtor's real property to its subsidiary to provide certainty as to the rental payment amount and to extend the term of the lease.

The Motion is made on the basis of the Declarations of Christine Hanna and Kevin Roy appended hereto, all pleadings, papers and records on file with the Court, and such other evidence, oral or documentary, as may be presented to the Court prior to or at the time of any hearing on the Motion, should a hearing be required.

**IF YOU DO NOT OPPOSE THE MOTION, YOU NEED NOT TAKE ANY FURTHER ACTION. HOWEVER, IF YOU DO OPPOSE THE MOTION, PURSUANT TO LOCAL BANKRUPTCY RULE 9013-1, ANY OPPOSITION TO THE MOTION MUST BE FILED WITH THE COURT NO LATER THAN FOURTEEN (14) DAYS PRIOR TO THE HEARING ON THE MOTION. YOU MUST FILE ANY SUCH OPPOSITION WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT, LOCATED 1415 STATE STREET, SANTA BARBARA, CA 93101. YOU MUST ALSO SERVE A COPY OF ANY SUCH OPPOSITION UPON COUNSEL FOR THE DEBTOR AT THE MAILING ADDRESS STATED IN THE UPPER LEFT CORNER OF THE FIRST PAGE OF THIS NOTICE AND UPON THE OFFICE OF THE UNITED STATES TRUSTEE LOCATED AT 915 WILSHIRE BLVD., SUITE 1850, LOS ANGELES, CA 90017. FAILURE TO TIMELY FILE AND SERVE AN OPPOSITION TO THE MOTION MAY RESULT IN ANY SUCH OPPOSITION BEING WAIVED, AND THE COURT MAY ENTER AN ORDER GRANTING THE MOTION WITHOUT FURTHER NOTICE. MOREOVER, SHOULD YOU FAIL TO ATTEND THE HEARING ON THE MOTION, THE COURT IS AUTHORIZED TO ENTER YOUR DEFAULT AND TO GRANT THE RELIEF REQUESTED BY THE DEBTOR IN THE MOTION.**

WHEREFORE, the Debtor respectfully requests that the Court enter an order:

273358

1.  Authorizing the Debtor to enter into the Amendment, which quantifies the rental obligation due under the lease and extends the term of the lease; and

2.  Granting such further relief as the Court deems appropriate.

DATED: June 24, 2025

**WINTHROP GOLUBOW HOLLANDER, LLP**

By:*/s/ Garrick A. Hollander*
     Garrick A. Hollander, Esq.
General Insolvency Counsel for Global Premier
Regency Palms Oxnard, L.P., Debtor and Debtor-in-
Possession

273358

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### INTRODUCTION

In order to ensure that the Debtor generates a quantifiable monthly rental payment for the benefit of all creditors, the Debtor needs, and to that end, hereby seeks authority to enter into the Amendment.  The Debtor believes that approval of the foregoing is in the best interests of the estate.

### II.

### BACKGROUND

**A.      The Debtor's Business**

The Debtor owns the real property located at 1020 Bismark Way, Oxnard, California (the "Property"), as well as a 100% equity interest in Global Regency Oxnard Senior Care Services, LLC dba Regency Palms Senior Living (the "Tenant"), which owns and operates an assisted living facility on the Property. The Tenant provides housing and a full spectrum of care and services to fragile seniors in need of a moderate level of medical assistance, including specialized memory care for seniors who suffer from Alzheimer's Disease and other forms of dementia. The Debtor's ability to generate revenue and value creation is dependent upon its ability to collect rent on the lease of the Property and its subsidiary Tenant's ability to generate income from its assisted living facility.

**B.      Pending Motion for Relief from Stay**

JKO Group, LLC ("JKO") filed a motion for relief from stay (the "RFS Motion"), which is scheduled to be heard on July 15, 2025.  Pursuant to the RFS Motion, JKO seeks to obtain relief from the stay to record a deed on the Property in the name of JKO, in which case JKO will become the owner of the Property, which would be subject to the Lease.

**C.      Debtor's Lease with Tenant**

On October 17, 2017, the Debtor entered into a Commercial Triple Net Lease Agreement (the "Lease") with the Tenant,  A true and correct copy of the Lease is attached hereto as **Exhibit 1** and incorporated herein by this reference.  Unfortunately, the Lease does not provide for a precise quantifiable amount of the Tenant's rental obligation.  In particular, the Lease provides that the rent payable to the Debtor by the Tenant is an amount equal to cover 100% of the debt service on the

273358

Property as calculated from time to time by the Debtor.  The debt service amount that is due on the Property is dependent upon the outcome of various legal matters.  For example, if the RFS Motion is granted, the Tenant will have no rental obligation pursuant to the terms of the Lease because the Debtor will have no debt service owing to JKO because JKO will no longer have a lien on the Property, but rather be the owner of the Property.  If, however, the RFS Motion is denied, then the debt service on the Property will be determined by the terms of a confirmed plan of reorganization.

Also pursuant to the Lease, the term expires October 17, 2027.  The short duration of the remaining term negatively impacts all creditors, including JKO.  Based on a short-term lease, the Property as well as the Tenant's business will struggle with raising capital or selling these assets.

**D.    Value of the Amendment**

Entry into the Amendment benefits all creditors.  The Debtor proposes to enter into the Amendment to the Lease, which provides for two modifications:

1.    Quantify the lease obligation to an amount certain - $44,375[2] - which represents the fair market rent for the Property; and

2.    Extend the term of the Lease for a period of twenty (20) years, plus two five (5) year options.

A true and correct copy of the Amendment is attached hereto as **Exhibit 2** and incorporated herein by this reference.  Entry into the Amendment is necessary to ensure that the Debtor (or JKO in the event the RFS Motion is granted) generates revenue to pay creditors.  Moreover, with a definitive rental income and long-term lease: (a) the Debtor will have a more valuable, financeable, and saleable asset, and (b) if the RFS Motion is granted, JKO and the Debtor will have a more valuable, financeable, and saleable asset.

The Debtor believes that the terms of the Amendment are fair and reasonable.  The Debtor has conducted due diligence on the market value of leases for premises of a similar nature and in similar areas as the subject Property.  Based on the Debtor's analysis, the Debtor has determined that the terms of the Amendment approximate market and is fair and reasonable.

---

[2] This represents the amount for the first year, with commercially reasonable annual increases as set forth in the Amendment.

273358

1    Based on the foregoing, Debtor believes that Court approval of the Amendment is in the best

2  interests of the estate.

3                                              III

4        **THE COURT SHOULD AUTHORIZE THE DEBTOR TO ENTER INTO THE**

5    **AMENDMENT BECAUSE IT IS WITHIN THE ORDINARY COURSE OF BUSINESS**

6    Section 363(c)(1) of the Bankruptcy Code provides that a debtor, without notice or court

7  approval, may enter into transactions within the "ordinary course" of the debtor's business.

8  Consequently, operations in the ordinary course of a debtor's business do not require bankruptcy

9  court approval.

10    Although the Bankruptcy Code does not define the term "ordinary course of business," the

11 Ninth Circuit Court of Appeals has determined that a transaction that meets both a "horizontal

12 dimension" test and a "vertical dimension" test of "ordinariness" is a transaction within a debtor's

13 "ordinary course of business."  In re Dant & Russell, 853 F.2d 700, 703-06 (9th Cir. 1988).

14    **A.    The "Horizontal Dimension" Test**

15    The "horizontal dimension" test applies an industry-wide perspective to a transaction and

16 involves a comparison of the debtor's business to other like businesses, and a determination of

17 whether the transaction is of a type that other similar businesses would engage in as "ordinary

18 business."  In re Dant & Russell, 853 F.2d at 704.  As Collier on Bankruptcy explains:

19
20        [t]he horizontal dimension test looks to similarly situated businesses and determines
         whether the transaction at issue is one that would normally be entered into by similar
         businesses.  In effect, this test is aimed at determining whether the transaction is
21       abnormal or unusual, in which case it is probably not in the ordinary course of
         business, or whether it is a reasonably common type of transaction.  Significantly, a
22       transaction may be considered reasonably common even if it does not occur
         frequently, provided that it is an ordinary type of transaction within the business and
23       the industry.[3]

24    Under the "horizontal dimension" test, therefore, a transaction is in the "ordinary course" of a

25 debtor's business if it is a reasonably common type of transaction within the debtor's business and the

26 debtor's industry.

27    **B.    The "Vertical Dimension" Test**

28

---

[3] Collier on Bankruptcy, ¶ 363.03[1][a] (15th ed. rev. 2001).

273358

The "vertical dimension" test examines a transaction from the viewpoint of a hypothetical creditor, focusing on the creditor's "reasonable expectations" of the type of transactions that the debtor is likely to enter into in the "ordinary course" of its business.  In re Dant & Russell, 853 F.2d at 705.  In utilizing the vertical dimension test, a bankruptcy court must look to the nature of the debtor's pre-petition business as compared to its post-petition business.  Id.  Collier further explains:

> [t]he vertical dimension test reviews the transaction from the perspective of creditors, asking whether the transaction is one that creditors would reasonably expect the debtor or trustee to enter into.  This test measures the types of risks that creditors impliedly agreed to when they extended credit to the debtor, and determines whether the transaction at issue is within the range of risks reasonably expected by creditors. … [T]ransactions of a type that the debtor commonly engaged in, or which the debtor might have reasonably been expected to engage in [pre-petition], are likely to be within the ordinary course of business after the commencement of a case.[4]

Therefore, under the "vertical dimension" test, a transaction is in the ordinary course of a debtor's business if the transaction is one into which creditors reasonably would expect the debtor to enter.

**C.    Entry into the Amendment Satisfies Both the "Horizontal" and "Vertical" Dimension Tests and Should, Therefore, Be Deemed to Be "Ordinary Course" Transactions and Thus Not Require Court Approval**

In this case, the evidence supports the conclusion that the Debtor's entry into the Amendment meets both the "horizontal" and "vertical" dimension tests articulated by the Ninth Circuit, and, accordingly, that such transaction should be considered to be in the "ordinary course" of the Debtor's business.

1.    _Horizontal Dimension Test_.  The Debtor seeks to enter into the Amendment, which is necessary for the Debtor, as a landlord, to generate rental income, and for its subsidiary Tenant, to generate income by continuing to provide housing and a full spectrum of care and services to fragile seniors in need of a moderate level of medical assistance, including specialized memory care for seniors who suffer from Alzheimer's Disease and other forms of dementia.  Entry into the Amendment will thus enable the Debtor to generate revenue from its Tenant and provide certainty of the existence of a lease for its subsidiary Tenant to also generate income from its business.  Thus,

---

[4] Collier on Bankruptcy, ¶ 363.03[1][b] (15th ed. rev. 2001).

273358

entry into the Amendment and extending the term of the Tenant's use of the Property not only

represents a typical transaction for a business for the Debtor, as a landlord, and the Debtor's

subsidiary Tenant, as an operator of an assisted living facility, but also makes economic sense, as the

Amendment provides the Debtor and subsidiary Tenant with the means to pay their creditors and pave

the way to a future sale or financing transaction.  Based on the foregoing, the Debtor believes that

entry into the Amendment satisfies the "horizontal dimension" test articulated by the Ninth Circuit.

        2.      <u>Vertical Dimension Test</u>.  It is core and thus common to the practice of a landlord to

lease its property and of an assisted living facility to use space for its services.  Therefore, it is

reasonable for creditors to expect that entities such as the Debtor and Tenant would enter into

contracts like the Amendment, particularly where the Debtor was already in contract with the Tenant

for the use of the Property.  Based upon the foregoing, the Debtor respectfully submits that this Court

should authorize the Debtor to enter into the Amendment to quantify the rental obligation and extend

the term of the Lease of the Property as a transaction in the ordinary course of the Debtor's business,

pursuant to the provisions of Section 363(c)(1) of the Bankruptcy Code.

**IV.**

**<u>EVEN IF ENTRY INTO THE AMENDMENT WAS NOT IN THE ORDINARY COURSE OF</u>**

**<u>BUSINESS, THE COURT SHOULD AUTHORIZE THE DEBTOR TO</u>**

**<u>ENTER INTO THE AMENDMENT</u>**

        To the extent that entry into the Amendment is characterized as outside the "ordinary course"

of the Debtor's operations, the Debtor recognizes that such a transaction would require the approval

of this Court.  See 11 U.S.C. § 363(b) (requiring "notice and a hearing" prior to the "use, sale or

lease" of property of the estate outside the ordinary course of business).  <u>See</u> <u>also</u> <u>In re Crystal</u>

<u>Apparel, Inc</u>., 220 B.R. 816, 829 (Bankr. S.D.N.Y. 1998) (noting that "[a] Chapter 11 debtor in

possession's transactions other than those in the ordinary course of business must be authorized by

the court after notice and a hearing").

        A.      **<u>Entry into the Amendment is an Exercise of Sound Business Judgment and</u>**
                **<u>Should be Approved</u>**

273358

Section 363(b) of the Bankruptcy Code empowers a debtor in possession to "use, sell, or lease . . . other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). A bankruptcy court's power to authorize a transaction under Section 363(b) is to be exercised at the court's discretion. In re WPRV-TV, 983 F.2d 336, 340 (1st Cir. 1993), New Haven Radio, Inc. v. Meister (In re Martin-Trigona), 760 F.2d 1334, 1346 (2d Cir. 1985), Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1069 (2d Cir. 1983); Stephens Indus., Inc. v. McClung, 789 F.2d 386, 390-91 (6th Cir. 1986).

In examining proposed post-petition business transactions, courts employ a deferential "business judgment" test. "A debtor-in-possession is accorded great deference as to its business judgments." In re Girard Medical Center, 1990 WL 56486, *2 (Bankr. E.D.Pa. 1990). See also In re Wheeling-Pittsburgh Steel Corp., 72 B.R. 845, 849 (Bankr. W.D.Pa. 1987) ("courts accord the debtor's business judgment a great amount of deference").

> As a debtor-in-possession, Simpco has authority to operate the business. 11 U.S.C. § 1108. The authority to operate that business necessarily includes the concomitant discretion to exercise reasonable judgment in ordinary business matters. The business of this debtor-in-possession includes oil and gas drilling operations. Simpco's best business judgment indicates these drilling operations are necessary and reasonable for the benefit of the estate. The discretion to act with regard to business planning activities is at the heart of the debtor's power. In exercising Simpco's business judgment of conducting its drilling operations, it has found it necessary to obtain loans to make these endeavors possible. This is in accordance with the exercise of its sound business discretion.
>
> Business judgments should be left to the board room and not to this Court. Only in circumstances where there are allegations of, and a real potential for, abuse by corporate insiders should the Court scrutinize the actions of the corporation. There are no allegations of insider abuse in this case.

In re Simasko Production Co., 47 B.R. 444, 449 (Bankr. D.Colo. 1985) (citations omitted). See also In re Curlew Valley Associates, 14 B.R. 506, 513-514 (Bankr. D.Utah 1981) ("the court will not entertain objections to a trustee's conduct of the estate where that conduct involves a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code."); Frostbaum v. Ochs, 277 B.R. 470, 475 (E.D.N.Y. 2002) ("So long as this decision was not made arbitrarily, or in bad faith, it was appropriate for the Bankruptcy Court to accept this decision for the benefit of the estate"); In re Thinking Machs. Corp., 182 B.R. 365, 368 (D.Mass.) (emphasizing "the high degree of deference usually afforded purely economic decisions of trustees"),

273358

1  *rev'd on other grounds*, 67 F.3d 1021 (1st Cir.1995); In re JFD Enterprises, Inc., 215 F.3d 1312, 2000

2  WL 560189, *5 (1st Cir. 2000) ("the trustee's business judgment is subject to great judicial

3  deference").

4          The Debtor, as owner of the Property, needs certainty as to its rental revenue.  The Debtor's

5  subsidiary Tenant needs certainty as to the right to use the Property and the costs in doing so.  Absent

6  approval of the Amendment, the Debtor's and its subsidiary Tenant's ability to generate income is

7  uncertain.  Providing concrete rental terms and a long term directly enhances the value of the

8  Debtor's Property and its subsidiary Tenant's assisted living facility business.  Accordingly, entry

9  into the Amendment will maximize value for the estate.  The Debtor believes the terms of the

10  Amendment approximates market.   Accordingly, entry into the Amendment is a proper exercise of

11  the Debtor's business judgment.

12          The Debtor's entry into the Amendment, which will enable the Debtor to generate rental

13  income and its Tenant to provide services to its patients and generate profits from its business for the

14  benefit of the estate and its creditors is an exercise of the Debtor's sound business judgment.  See,

15  e.g., In re Copy Crafters Quickprinting, Inc., 92 B.R. 973, 983 (Bankr. N.D.N.Y. 1988); In re

16  Industrial Valley Refrig. and Air Cond. Supplies, Inc., 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987) (in the

17  commonly considered context of the sale of business assets under section 363(b), noting that a "sound

18  business judgment" must justify the transaction).  See also In re Levinson Steel Co., 117 B.R. 194,

19  196 (W.D. Pa. 1990) (approving severance pay plan as "necessary incentive for continued

20  employment" by certain of the debtor's employees).  Accordingly, with the notice given to creditors

21  set forth above, this Court should authorize the Debtor to enter into the Amendment.

22      **B.**      **The Debtor Has Provided Notice to Creditors of the Debtor's Intention to Enter**

23              **into the Amendment, Which Notice Is Sufficient to Satisfy the Requirements of**

24              **Section 363(b)**

25          The purpose of imposing on a debtor the requirement to obtain court approval for a transaction

26  outside the ordinary course of the debtor's business is simply to provide to creditors, who have an

27  interest in maximizing realization from assets of the estate, an opportunity to review the terms of the

28  transaction and to object thereto if they deem the transaction not to be in their best interest.  In re

273358

1   Crystal Apparel, 220 B.R. at 830 (citing In re Caldor, 193 B.R. 182, 186 (Bankr. S.D.N.Y. 1996)).

2   Thus, the standard for approval of a transaction not in the ordinary course of business is whether

3   creditors have had an opportunity to review the proposed transaction, and to afford those creditors an

4   opportunity to be heard in the event that those creditors believe that the transaction is not in their best

5   interests.  In re James A. Phillips, Inc., 29 B.R. 391, 394 (S.D.N.Y. 1983) ("[T]he apparent purpose of

6   requiring notice only where the use of property is extraordinary is to assure interested persons of an

7   opportunity to be heard concerning transactions different from those that might be expected to take

8   place so long as the debtor-in-possession is allowed to continue normal business operations...").

9        In this case, as discussed above, the Debtor believes that entry into the Amendment constitutes

10  business conducted in the "ordinary course" of its and its Tenant's operations.   Moreover, entry into

11  the Amendment is effectively amending a lease that currently exists.  The Amendment will preserve

12  the Debtor's ability to generate income.  Creditors will receive notice of the hearing on the Motion.

13  Therefore, the Debtor submits that such notice is sufficient to meet the requirements of Section

14  363(b) in the event that this Court should determine that such a transaction is not within the ordinary

15  course of the Debtor's business operations.

**V.**

**CONCLUSION**

18       For the foregoing reasons, the Debtor respectfully requests that the Court grant the relief

19  prayed for herein.

20  DATED:  June 24, 2025                    **WINTHROP GOLUBOW HOLLANDER, LLP**

22                                                      By: */s/ Garrick A. Hollander*
23                                                             Garrick A. Hollander, Esq.
                                                              General Insolvency Counsel for Debtor and
24                                                             Debtor-in-Possession

273358

## DECLARATION OF CHRISTINE HANNA

I, Christine Hanna, hereby declare as follows:

1.      I am the manager of Global Premier America #3 LLC, the general partner of Global Premier Regency Palms Oxnard, LP, the debtor and debtor-in-possession in the above Chapter 11 proceeding (the "Debtor"). The matters set forth here are within my own personal knowledge, and, if called upon to testify, I can and will do so competently and truthfully.

2.      As manager, I am involved in leasing the Property, as well as seeking and obtaining financing for the Property.

3.      The Debtor owns the real property located at 1020 Bismark Way, Oxnard, California (the "Property"), as well as a 100% equity interest in Global Regency Oxnard Senior Care Services, LLC dba Regency Palms Senior Living (the "Tenant"), which owns and operates an assisted living facility on the Property. The Tenant provides housing and a full spectrum of care and services to fragile seniors in need of a moderate level of medical assistance, including specialized memory care for seniors who suffer from Alzheimer's Disease and other forms of dementia. The Debtor's ability to generate revenue and value creation is dependent upon its ability to collect rent on the lease of the Property and its subsidiary Tenant's ability to generate income from its assisted living facility.

4.      JKO Group, LLC ("JKO") filed a motion for relief from stay (the "RFS Motion"), which is scheduled to be heard on July 15, 2025.  Pursuant to the RFS Motion, JKO seeks to obtain relief from the stay to record a deed on the Property in the name of JKO, in which case JKO will become the owner of the Property, which would be subject to the Lease.

5.      On October 17, 2017, the Debtor entered into a Commercial Triple Net Lease Agreement (the "Lease") with the Tenant,  A true and correct copy of the Lease is attached hereto as **Exhibit 1** and incorporated herein by this reference.  Unfortunately, the Lease does not provide for a precise quantifiable amount of the Tenant's rental obligation.  In particular, the Lease provides that the rent payable to the Debtor by the Tenant is an amount equal to cover 100% of the debt service on the Property as calculated from time to time by the Debtor.

273358

6.      Also pursuant to the Lease, the term expires October 17, 2027.  The short duration of the remaining term negatively impacts all creditors, including JKO.  Based on a short-term lease, the Property as well as the Tenant's business will struggle with raising capital or selling these assets.

7.      Entry into the Amendment benefits all creditors.  The Debtor proposes to enter into the Amendment to the Lease, which provides for two modifications:

        a.   Quantify the lease obligation to an amount certain - $44,375[5] - which represents the fair market rent for the Property; and

        b.   Extend the term of the Lease for a period of twenty (20) years, plus two five (5) year options.

8.      A true and correct copy of the Amendment is attached hereto as **Exhibit 2** and incorporated herein by this reference.  Entry into the Amendment is necessary to ensure that the Debtor (or JKO in the event the RFS Motion is granted) generates revenue to pay creditors.  Moreover, with a definitive rental income and long-term lease: (a) the Debtor will have a more valuable, financeable, and saleable asset, and (b) if the RFS Motion is granted, JKO and the Debtor will have a more valuable, financeable, and saleable asset.

9.      I believe that the terms of the Amendment are fair and reasonable.  I have conducted due diligence on the market value of leases for premises of a similar nature and in similar areas as the subject Property.  Based on my analysis, I have determined that the terms of the Amendment approximate market and is fair and reasonable.

10.     The Debtor seeks to enter into the Amendment, which is necessary for the Debtor, as a landlord, to generate rental income, and for its subsidiary Tenant, to generate income by continuing to provide housing and a full spectrum of care and services to fragile seniors in need of a moderate level of medical assistance, including specialized memory care for seniors who suffer from Alzheimer's Disease and other forms of dementia.  Entry into the Amendment will thus enable the Debtor to generate revenue from its Tenant and provide certainty of the existence of a lease for its subsidiary Tenant to also generate income from its business. Thus, entry into the Amendment and extending the term of the Tenant's use of the Property not only represents a typical transaction for a business for the

---

[5] This represents the amount for the first year, with commercially reasonable annual increases as set forth in the Amendment.

273358

Debtor, as a landlord, and the Debtor's subsidiary Tenant, as an operator of an assisted living facility, but also makes economic sense, as the Amendment provides the Debtor and subsidiary Tenant with the means to pay their creditors and pave the way to a future sale or financing transaction.

11.     It is core and thus common to the practice of a landlord to lease its property and of an assisted living facility to use space for its services.  Therefore, it is reasonable for creditors to expect that entities such as the Debtor and Tenant would enter into contracts like the Amendment, particularly where the Debtor was already in contract with the Tenant for the use of the Property.

12.     Based on the foregoing, I believe that Court approval of the Amendment is in the best interests of the estate.

13.     In order for the Debtor to generate rental income and its Tenant subsidiary to generate a profit from its assisted living facility, it is necessary to obtain authority to enter into the Amendment.  Accordingly, I believe that Court approval of the Amendment is in the best interests of the estate.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 23rd day of June 2025, at Irvine, California.

Christine Hanna

273358

## <u>DECLARATION OF KEVIN ROY</u>

I, Kevin Roy, hereby declare as follows:

1.      I am the Managing Partner at Healthcare Finance Partners, with a specialized focus in healthcare real estate capital markets.  I advise healthcare operators, REITs, and private equity firms on strategic real estate investments, acquisitions, and operational alignment.

2.      I hold a California Real Estate Broker's License, as well as a California Finance Lenders Law license.  I have extensive experience representing hospital systems, skilled nursing facilities, rehabilitation cents, and senior housing operators in brokering transactions.  I am also expert in operational metrics and their impact on real estate value, with a focus on aligning financial and facility performance to capital market strategy.

3.      I was contacted by Eric J. Weissman of Wilshire Pacific, financial advisor to, and on behalf of, the Debtor, to evaluate and determine the fair market value of rent for the real property located at 1020 Bismark Way, Oxnard, California (the "Property").

4.      In the course of my analysis, I reviewed historical financials of the assisting living facility (the "Facility") using the Property, using the trailing twelve months of financials of the tenant, as well as comparable rent surveys, cap rates, net income, and values for comparable sized and aged assisted living facilities in Southern California in general, and the local market, in particular.

5.      Based on my review and analysis of the foregoing, I have determined that the fair market rent for use of the Property is approximately $44,377.

6.      The value of the Property and Facility will be impacted by not only the amount of rent, but also by the duration of the lease.  I believe that the value of the Property and Facility will be significantly less with a short-term lease.  Moreover, the owner of the Property and Facility are likely to struggle with raising capital or selling either of these assets with a short-term lease.

7.      Based on the foregoing, I believe that fixing the rent to the market rate and extending

/ / /

/ / /

/ / /

/ / /

273358

the term of the lease to a long-term lease will increase the value of the Property and Facility, as well as increase the likelihood of being able to finance and/or sell the Property and Facility.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 23rd day of June 2025, at Irvine, California.

_____
Kevin Roy

273358

# EXHIBIT 1

# COMMERCIAL TRIPLE NET (NNN) LEASE AGREEMENT

On this 17th day of October, 2017, Global Premier Regency Palms Oxnard, LP, a California limited partnership with a mailing address of 2010 Main Street, Suite 1250, in the City of Irvine, State of California ("Lessor") and Global Regency Oxnard Senior Care Services, LLC, a California limited liability company, with a mailing address of 2010 Main Street, Suite 1250, in the City of Irvine, State of California ("Lessee") entered into this Lease Agreement ("Agreement") for the lease of the premises located at 1020 Bismark Way, in the City of Oxnard, State of California ("Premises" or "Property") together with the right of ingress and egress and the non-exclusive use of common areas, pursuant to the following terms and conditions:

1. **PREMISES.** The Premises is located at 1020 Bismark Way, Oxnard CA 93033 and consists of 53,202+/- Square Feet (SF).

2. **USE.** The Premises shall be used only as follows: Assisted Living and Memory Care Facility (collectively, the "Permitted Use"). Any use by the Lessee that does not corresponding to the Permitted Use shall be prior written consent of the Lessor only.

3. **TERM**: The term ("Lease Term") of this Agreement shall be for 5 Years and begin on the date of issuance of the Certificate of Occupancy from the City of Oxnard and continue through until:

   X The Lessee shall have the option to renew this Agreement for an additional 1 renewal period(s) in terms of 5 Years upon the same conditions set forth herein subject to the increase in rent set forth in Section 3. Lessee shall provide Lessor with 60 days notice before the expiration of the exercise of this renewal option.

   ☐ The Lessee shall NOT have the option to renew this Agreement.

4. **Rent**: The total amount of rent payable by the Lessee to the Lessor for the Property throughout the Lease Term is an amount equal to cover 100% of the debt service on the Property as calculated from time to time by the Lessor. Said Rent shall be paid monthly on the 1st day of each month until the end of the Lease Term.

5. **SECURITY DEPOSIT. (N/A)** Upon the execution of this Agreement, Lessee shall deliver to Lessor _____ Dollars ($_____) as a non-interesting bearing security deposit to secure the performance by Lessee of the provisions and conditions of this Agreement (the "Security Deposit"). In the event Lessee fails to pay the rent or otherwise defaults on any provision herein, Lessor may apply the whole or any part of the Security Deposit

EXHIBIT 1 - PAGE 1

to the payment of any sum in default or any of Lessee's damages as a result of default. If any portion of the Security Deposit is applied, Lessee, upon demand by Lessor, shall deposit an amount sufficient to return the Security Deposit to its original amount. Should Lessee comply with all of the covenants and conditions of this Agreement, the Security Deposit or any balance thereof shall be returned to within 30 days of the expiration of the Term.

6. **POSSESSION**. Possession shall commence within thirty (30) days of the issuance of the Certificate of Occupancy by the City of Oxnard to the Lessor.

7. **OPERATING EXPENSES.** Lessor and Lessee agree that this Agreement shall be considered a triple net lease. Lessee agrees to pay directly or reimburse Lessor for advanced payments, one hundred percent (100%) of all costs of operating and maintaining the Building and related parking areas, and shall include, without limitation, real estate and personal property taxes and assessments, management fee, heating, electricity, water, waste disposal, sewage, operating materials and supplies, service agreements and charges, lawn care, snow removal, restriping, repairs, repaving, cleaning and custodial, security, insurance, the cost of contesting the validity or applicability of any governmental acts which may affect operating expenses, and all other direct operating costs of operating and maintaining the Building and related parking areas, unless expressly excluded from operating expenses. ("Operating Expenses") Notwithstanding the foregoing, Operating Expenses shall not include any amount related to (i) a capital account or capital improvement (ii) ground leases (iii) principal or interest payments on any mortgage or deed of trust on the premises; (iv) any amount for which Lessor is reimbursed through insurance, by third persons, or directly by other Lessees of the premises, (iv) repair costs as a result of fire, windstorm or other casualty, (v) leasing commissions and other expenses incurred in connection with leasing any other area located on the premises to any other party, (vi) costs of items and services for which Lessee reimburses Lessor or pays third persons directly.

8. **TAXES**. During the Term, Lessee shall be obligated to pay the real estate taxes and any other taxes including leasehold taxes and/or assessments (collectively, the "taxes") attributable to the premises and accruing during the Term. Lessee, at Lessor's option, shall pay to Lessor said taxes on a monthly basis, based on one-twelfth (1/12) of the estimated annual amount for taxes. Taxes for any fractional calendar year during the Term shall be prorated. In the event Lessee does not make any tax payment required hereunder, Lessee shall be in default of this Agreement.

9. **PROPERTY INSURANCE.** Lessor shall name Lessee as an Additional Insured on the insurance currently in place with respect to the Property as is evidenced by the Evidence of Commercial Property Insurance attached hereto as **Exhibit A**.

10. **LESSOR INDEMNITY AND LIABILITY INSURANCE**. Lessor shall indemnify, defend and hold Lessee harmless from all loss, liability, costs, damages and

EXHIBIT 1 - PAGE 2

expenses that may occur or be claimed with respect to any person or persons, or property on or to the Common Areas resulting from any act done or omission by or through Lessor, its agents, employees, invitees or any person on the Common Areas. Lessor shall maintain, at all times during the Lease Term, comprehensive general liability insurance equal to the insurance evidenced by the Certificate of Liability Insurance attached hereto as **Exhibit B**, which insurance shall name Lessee as Additional Insured.

11. **MULTIPLE TENANCY COMPLEX. (N/A)** If the Premises are a part of a multiple tenancy complex, the responsibility of Lessee for costs are determined by taking a percentage of the total cost of the expenses based upon the rentable floor space in said complex occupied by Lessee. It is agreed Lessee occupies _____ Percent (___%) ("Proportionate Share") of the floor space in the Complex for which the Premises are a part (_____ Portion SF/_____ Total = _____ %).

    a. Lessor may, with notice to Lessee, elect to perform and provide certain maintenance and services pertaining to the entire building or area of which the Premises are a part including, but not limited to, landscaping, trash removal, lawn maintenance, common area lighting, watering, paving maintenance and snow removal. In such event, Lessee shall reimburse Lessor for its Proportionate Share of such maintenance services.

    b. Within ninety (90) days following the end of each year during the Term, Lessor shall furnish Lessee a written statement covering the lease year just expired (measured from the Commencement Date), showing in reasonable detail a general breakdown of the total operating costs, the amount of Lessee's obligation relating thereto, and the total payments made by Lessee.

    c. Lessee agrees to conduct its business in a lawful and legal manner and in a manner that provides quiet enjoyment to the rest of the Lessees in the Complex, including but not limited to mitigation and limitation of noise, vibration, odor, trash or fumes. In the event Lessor receives complaints from other Lessees in the building or complex and determines, in its sole reasonable judgment, that Lessee is conducting its operations in a manner so as to be objectionable to other Lessees, Lessee shall, upon notice from Lessor, promptly modify its operations to eliminate such objections.

12. **ASSIGNMENT AND SUBLETTING.** Lessee shall not assign, transfer or encumber this Agreement in anyway and shall not sublease the Premises or any part thereof or allow any other person to be in possession thereof without the prior written consent of Lessor, in each and every instance. For the purpose of this provision, any transfer of a majority or controlling interest in Lessee (whether in one or more related or unrelated transactions), whether by transfer of stock, consolidation, merger, transfer of a partnership interest or transfer of any or all of Lessee's assets or otherwise, or by operation of law, shall be deemed an assignment of this Agreement. Notwithstanding any permitted assignment or

EXHIBIT 1 - PAGE 3

subletting, Lessee shall at all times remain directly, primarily and fully responsible and liable for the payment of the rent herein specified and for compliance with all of its other obligations under the terms and provisions of this Agreement.

13. **SIGNAGE AND ALTERATIONS**. Lessee shall not place any signs, billboards or advertisements upon the Premises without the prior written consent of Lessor. Lessee is responsible for the costs of any permitted signage. Lessee shall not make any material or structural alterations or additions in or to the Premises without the prior written consent of Lessor.

14. **TOXIC OR HAZARDOUS MATERIALS**. Lessee shall not store, use or dispose of any toxic or hazardous materials in, on or about the Premises without the prior written consent of Lessor. Lessee shall be solely responsible for and shall defend, indemnify and hold Lessor, its agents and employees, harmless from and against all claims, costs and liabilities, including attorney's fees and costs, arising out of or in connection with the Lessee storage, use or disposal of any toxic or hazardous material in, on or about the Premises. Lessee's obligations under this paragraph shall survive the termination of this Agreement.

15. **CONDITION OF PREMISES**. Lessee acknowledges that it has inspected the Premises and upon issuance of the Certificate of Occupancy by the City of Oxnard, Lessee agrees to accept the Premises in its then current condition. At the end of the Lease Term, Lessee, at its expense, shall (i) surrender the Premises in the same condition as existed at the time the commencement of the Lease Term, reasonable wear and tear excepted; (ii) have removed all of Lessee's property from the Premises; (iii) have repaired any damage to the Premises caused by the removal of Lessee's Property; and (iv) leave the Premises free of trash and debris and the building in "broom clean" condition.

16. **LESSOR'S RIGHT OF ENTRY**. Lessor or Lessor's agent may enter at reasonable hours to inspect or show the Premises to prospective lenders and purchasers, and to do anything Lessor may be required to do hereunder or which Lessor may deem necessary for the good of the Premises or any building of which they are a part. During the last 90 days of the Lease Term, Lessor may display a "For Rent" sign on the Premises and show the Premises to prospective lessees.

17. **DAMAGE BY CASUALTY**. If, during the Lease Term or previous thereto, the premises shall be destroyed or so damaged by fire or other casualty as to become un-leasable, then, at the option of Lessor, this Agreement shall terminate from the date of such damage or destruction. Lessor shall exercise this option to so terminate this Agreement by notice in writing delivered to Lessee within 30 days after such casualty. Upon such notice, Lessee shall immediately surrender said Premises and all interest therein to Lessor, and Lessee shall pay rent up until the date of casualty. If Lessor does not elect to terminate this Agreement, this Agreement shall continue in full force and effect, and Lessor shall expeditiously repair the Premises, placing the same in as good a condition as they were at the time of the damage or destruction. Rent shall be prorated

EXHIBIT 1 - PAGE 4

taking into account the amount of time Lessee is unable to occupy the Premises. If the Premises shall be slightly damaged by fire or other casualty, but is still leasable, then Lessor shall expeditiously repair the same with no rent proration. Lessee may not make a claim for compensation by reason of any inconvenience or loss of business arising from the necessity of repairing any portion of the building or the Premises.

18. **PERSONAL PROPERTY**. Lessor shall not be liable for any loss or damage to any inventory, goods, fixtures, improvements or personal property of Lessee on or about the Premises.

19. **APPLICATION OF LAW**. Lessee shall comply with all laws, ordinances, regulations and other legal requirements affecting the Premises and the use thereof, and Lessee shall indemnify, defend and hold Lessor harmless from expense or damage resulting from failure to do so.

20. **FIXTURES**. Except for Lessee's personal property and trade fixtures, all buildings, repairs, alterations, additions, improvements, installations and other non-trade fixtures installed or erected on the Premises, whether by or at the expense of Lessor or Lessee, shall belong to Lessor and shall remain on and be surrendered with the Premises at the expiration or termination of this Agreement. However, at Lessor's option, Lessee shall remove Lessee's alterations or improvements prior to the expiration of this Agreement and return the Premises to its original condition.

21. **EMINENT DOMAIN**. Should all or a part of the Premises be taken under eminent domain so that the Premises are unsuitable, in Lessee's reasonable opinion, for Lessee's use, then the term of this Agreement shall terminate as of the date that title shall vest in the acquiring authority and the rent and other charges shall be adjusted as of the date of such taking. The Lessor shall be entitled to the proceeds of the eminent domain award made to Lessor. Nothing herein shall be construed to prevent Lessee from separately pursuing a claim against the requisite authority for Lessee's independent loss or damages to the extent available, provided, however, that no award to Lessee shall reduce the award to Lessor. Lessee shall have no claim against Lessor for the value of the unexpired term of this Agreement.

22. **WAIVER OF SUBROGATION**. The parties will each look to its own insurance for recovery of any loss resulting from fire or other casualty. Lessor and Lessee release one another from such claims and waive any right of recovery of insured claims by anyone claiming through them, by way of subrogation or otherwise, including their respective insurers. This release and waiver remains effective despite either party's failure to obtain insurance. If either party fails to obtain insurance, it bears the full risk of its own loss.

23. **DEFAULT AND REMEDIES**. If: (a) Lessee fails to comply with any term, provision, condition or covenant of this Agreement; (b) Lessee deserts or vacates the Premises; (c) any petition is filed by or against Lessee under any section or

EXHIBIT 1 - PAGE 5

chapter of the Federal Bankruptcy Act, as amended, or under any similar law or statute of the United States or any state thereof; (d) Lessee becomes insolvent or makes a transfer in fraud of creditors; (e) Lessee makes an assignment for benefit of creditors; or (f) a receiver is appointed for Lessee or any of the assets of Lessee, then in any of such events, Lessee shall be in default and Lessor shall have the option to do any one or more of the following: (i) to enter upon the Premises either with or without process of law, and to expel, remove and put out Lessee or any other persons thereon, together with all personal property; (ii) terminate this Agreement; (iii) rent said Premises or any part thereof for such term or terms and at such terms and conditions as Lessor in its sole discretion may deem advisable, with the right to repair, renovate, remodel, redecorate, alter and change said Premises. At the option of Lessor, rents received by Lessor from such reletting shall be applied in order as follows: (a) to the payment of any indebtedness from Lessee to Lessor other than rent due; (b) to the payment of any costs and expenses of such reletting, including, but not limited to, attorney's fees, advertising fees and brokerage fees, and to the payment of any repairs, renovation, remodeling, redecorations, alterations and changes in the Premises, (c) to the payment of rent and additional rent due and payable hereunder and interest thereon; and, if after applying said rentals there is any deficiency in the rent and additional rent and interest to be paid by Lessee under this Agreement, Lessee  shall pay any such deficiency to Lessor and such deficiency shall be calculated and collected by Lessor monthly. No such re-entry or taking possession of said Premises shall be construed as an election on Lessor's part to terminate this Agreement unless a written notice of such intention is given to Lessee. Notwithstanding any such reletting without termination, Lessor may at any time terminate this Agreement by reason of any default, in addition to any other remedy it may have.

24. **WAIVER**. The rights and remedies of Lessor under this Agreement, as well as those provided by law, shall be cumulative, and none shall be exclusive of any other rights or remedies. A waiver by Lessor of any breach or default of Lessee shall not be deemed or construed to be a continuing waiver of such breach or default nor as a waiver of or permission, expressed or implied, for any subsequent breach or default. It is agreed that the acceptance by Lessor of any installment of rent subsequent to the date the same should have been paid shall not alter the covenant and obligation of Lessee to pay subsequent installments of rent promptly upon the due date. Receipt by Lessor of partial payment after Lessee's default shall not be construed to be or constitute a cure of any such default. No receipt of money by Lessor before or after the termination of this Agreement shall in any way reinstate, continue or extend the term above demised.

25. **NOTICES**. Any notice hereunder shall be sufficient if sent by certified mail, addressed to:

Lessor:

EXHIBIT 1 - PAGE 6

Global Premier Regency Palms Oxnard, LP
2010 Main Street, Suite 1250
Irvine, CA 92614

Lessee:

Global Regency Oxnard Senior Care Services, LLC
2010 Main Street, Suite 1250
Irvine, CA 92614

26. **SUBORDINATION.** This Agreement shall be subject and subordinate at all times to the any existing mortgages and any mortgages hereinafter obtained on the Premises.

27. **SUCCESSORS**. The provisions, covenants and conditions of this Agreement shall bind and inure to the benefit of the legal representatives, heirs, successors and assigns of each of the parties hereto, except that no assignment or subletting by Lessee without the written consent of Lessor shall vest any rights in the assignee or sublessee of Lessee.

28. **QUIET POSSESSION**. Lessor agrees, so long as Lessee fully complies with all of the terms, covenants and conditions of this Agreement, Lessee shall and may peaceably and quietly have, hold and enjoy the Premises for the Term, and such right to quiet enjoyment shall be binding upon Lessor, its heirs, successors or assigns, but only during such party's ownership of the Premises.

29. **AUTHORITY.** Lessor and Lessee further covenant and represent that each has full right, title, power and authority to make, execute and deliver this Agreement.

30. **BANKRUPTCY**. Neither this Agreement nor any interest therein nor any estate hereby created shall pass to any trustee or receiver in bankruptcy or to any other receiver or assignee for the benefit of creditors by operation of law or otherwise during the Term or any renewal thereof.

31. **ENTIRE AGREEMENT**. This Agreement contains the entire agreement between the parties, and no modification of this Agreement shall be binding upon the parties unless evidenced by an agreement in writing signed by Lessor and Lessee after the date hereof. If there be more than one Lessee named herein, the provisions of this Agreement shall be applicable to and binding upon such Lessees, jointly and severally.

32. **ESTOPPEL CERTIFICATES**. Lessee shall at any time upon not less than ten (10) days prior written notice from Lessor execute, acknowledge and deliver to Lessor or to any lender of or purchaser from Lessor a statement in writing certifying that this Agreement is unmodified and in full force and effect (or if modified stating the nature of such modification) and the date to which the rent and other charges are paid in advance, if any, and acknowledging that there are not, to Lessee's knowledge, any uncured defaults on the part of Lessor or

EXHIBIT 1 - PAGE 7

specifying such defaults if any are claimed. Any such statement may be conclusively relied upon by any prospective purchaser or encumbrances of the Premises or of the business of Lessor.

33. **EXHIBITS**: The following Exhibits are incorporated herein.

X Exhibit A: Evidence of Commercial Property Insurance

X Exhibit B: Certificate of Liability Insurance

IN WITNESS WHEREOF, said parties hereunto subscribed their names. Executed in originals.

**Lessor:**

**Global Premier Regency Palms Oxnard, LP**

By:    Global Premier America #3, LLC
Its:    General Partner

By: _____
        Christine Hanna, Manager

**Lessee:**

**Global Regency Oxnard Senior Care Services, LLC**

By:    Global Premier Regency Palms Oxnard, LP
Its:    Manager

        By:    Global Premier America #3, LLC
        Its:    General Partner

By: _____
        Christine Hanna, Manager

EXHIBIT 1 - PAGE 8

# EXHIBIT 2

**FIRST AMENDMENT TO COMMERCIAL TRIPLE NET LEASE AGREEMENT**

This FIRST AMENDMENT TO COMMERCIAL TRIPLE NET LEASE AGREEMENT ("**Amendment**") is entered into as of July 15, 2025 ("**Effective Date**"), by and between GLOBAL PREMIER REGENCY PALMS OXNARD, LP, a California limited partnership ("**Landlord**"), and GLOBAL REGENCY OXNARD SENIOR CARE SERVICES, LLC, a California limited liability company ("**Tenant**"), with reference to the facts set forth in the Recitals below.

## RECITALS

A.      Landlord and Tenant are parties to that certain Commercial Triple Net Lease Agreement dated October 17, 2017 ("**Lease**"), for certain Premises located at 1020 Bismark Way, Oxnard, CA 93033, consisting of approximately 53,202 Square Feet, as more specifically described in the Lease.

B.      On March 11, 2025, Landlord filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

## AMENDMENT

NOW, THEREFORE, in consideration of the Recitals above, the mutual covenants and conditions below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      <u>Rent</u>.  Notwithstanding any provision of the Lease to the contrary, commencing August 1, 2025, the monthly rent due under the Lease shall equal $43,375 ("Base Rent").  The monthly rental obligation shall increase every year by an amount equal to the lesser of: (a) 2.5% of  the Base Rent, or (b) the CPI (Consumer Price Index) for medical buildings in Southern California.

2.      <u>Term</u>.  The term of the lease shall expire September 31, 2047, with two options to extend the term of the Lease for a period of five years each.  Tenant shall give written notice to Landlord to extend each of the options by no later than sixty days prior to the expiration of the Lease.

3.      <u>Brokers</u>.  Tenant represents and warrants to Landlord that no party is entitled to a commission or fee by or though Tenant in connection with this Amendment.  Tenant shall hold Landlord free and harmless from any and all claims, demands, losses, liabilities, lawsuits, judgments, costs and expenses (including without limitation reasonable attorneys' fees) with respect to any leasing commission or equivalent compensation alleged to be owing on account of any dealings with any party claiming by or through Tenant.

4.      <u>Defined Terms</u>.  Unless otherwise specifically defined in this Amendment, terms with initial capital letters in this Amendment shall have the same meaning as such terms have in the Lease.

5.      <u>No Construction Against Party Drafting Amendment</u>.  Landlord and Tenant acknowledge and agree that each of them, and their respective professional advisors, have reviewed this Amendment and that the provisions of this Amendment shall not be construed against either party.  The rule of construction that ambiguities are to be construed against the party drafting the agreement shall not apply to the interpretation of this Amendment and is waived.

6.      <u>Counterpart Execution</u>. This Amendment may be executed in multiple counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which together shall constitute one instrument.

1

7.      <u>Continued Effect</u>.  Except as specifically modified by this Amendment, all of the terms, conditions and provisions of the Lease shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have executed this First Amendment to Lease Agreement as of the Effective Date.

LANDLORD:                          GLOBAL PREMIER REGENCY PALMS OXNARD,
                                   LP, a California limited partnership


                                   By:  GLOBAL PREMIER REGENCY PALMS
                                        OXNARD, LP, a California limited partnership,
                                        its General Partner


                                        By: _____
                                        Name:  Christine Hanna
                                        Title:   Manager




TENANT:                            GLOBAL REGENCY OXNARD SENIOR CARE
                                   SERVICES, LLC, a California limited liability
                                   company


                                   By: _____
                                        Name:        Chrstine Hanna
                                        Its:         Manager

**PROOF OF SERVICE OF DOCUMENT**

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:  1301 Dove Street, Suite 500, Newport Beach, CA 92660

A true and correct copy of the foregoing document entitled: **DEBTOR'S MOTION FOR ORDER AUTHORIZING DEBTOR TO ENTER INTO REAL PROPERTY LEASE AMENDMENT WITH TENANT; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATIONS OF CHRISTINE HANNA AND KEVIN ROY IN SUPPORT THEREOF** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **June 24, 2025**.  I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Brian David Fittipaldi**    brian.fittipaldi@usdoj.gov
- **Garrick A Hollander**    ghollander@wghlawyers.com,
  jmartinez@wghlawyers.com;svillegas@wghlawyers.com
- **Matthew D Pham**    mpham@allenmatkins.com, mdiaz@allenmatkins.com
- **Debra Riley**    driley@allenmatkins.com, plewis@allenmatkins.com
- **Jeremy H Rothstein**    jrothstein@gblawllp.com, msingleman@gblawllp.com;mbowes@gblawllp.com
- **United States Trustee (ND)**    ustpregion16.nd.ecf@usdoj.gov

☐ Service information continued on attached page

**2.  SERVED BY ELECTRONIC MAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **June 24, 2025**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**3.  SERVED BY** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____.  I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| June 24, 2025 | Silvia Villegas | /s/ Silvia Villegas |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

-17-

273358

Label Matrix For local noticing
0973-9
Case 9:25-bk-10329-RC
Central District of California
Santa Barbara
Tue Apr 15 10:15:47 PDT 2025

Global Premier Regency Palms Oxnard LP
Christine Hanna
2020 Main St. Suite 300
Irvine, CA 92614

United States Trustee (LA)
915 Wilshire Blvd., #1850
Los AngelesCA90017

Northern Division
1415 State Street
Santa Barbara, CA 93101-2511

Andrew Hanna
Global Premier Development, Inc.
2010 Main Street, Suite 300
Irvine, CA 92614

California Dept of Tax and Fee Adm
Collection Support Bureau Bk Team
Mic: 74PO Box 942879
Sacramento, CA 94279-0001

California Dept. of Tax
and Fee Adm
Account Info Grp, MIC: 29
PO Box 942879
Sacramento, CA 94279

Christine Hanna
326 Quail Ridge
Irvine CA 92603

**20 LARGEST**
Door Systems
Attn: Mario Martinez
1150 La Brisas Place
Placentia, CA 92870-6643

Franchise Tax Board
Bankruptcy Section MS: A-340
PO Box 2952
Sacramento, CA 95812-2952

**20 LARGEST**
Franchise Tax Board
PO Box 942857
Sacramento CA 94257-0531

Global Premier Regency Palms
Oxnard, LP
Attn: Christine Hanna
2020 Main Street Suite 300
Irvine CA 92614

**20 LARGEST**
Gary White
4206 Great Plains Dr NE
Salem OR 97305

**20 LARGEST**
Global Bancorp
Attn: Nina Hanna
8 Hilltop
Irvine CA 92603

Global Premier America LLC
c/o Christine Hanna (Reg Agent)
2020 Main Street Suite 300
Irvine, CA 92614

Global Premier America LLC
Attn: Christine Hanna
2020 Main Street Suite 300
Irvine, CA 92614

**20 LARGEST**
Global Realty and Investment Corp.
Attn: Nina Hanna
8 Hilltop
Irvine, CA 92603

Global Regency Oxnard
Senior Care Services, LLC
2020 Main St. Suite 300
Irvine, CA 92614

**SECURED**
JKO Group LLC
Attn: Jeremy Rothstein
G&B Law16000 Ventura Blvd
Suite 1000
Encino, CA 91436-2730

**20 LARGEST**
JTC USA Holdings
Attn: Dawn Shuster
75 State Street Suite 2801
Boston MA 02109

**SECURED**
Jones Hall, A Professional Law Corp
Attn: Corp Officer
475 Sansome Street, Suite 1700
San Francisco, CA 94111

Los Angeles County Tax Collector
PO Box 54110
Los Angeles, CA 90054-0110

**20 LARGEST**
Magdy Hanna
2200 Park Newport, #401
Newport Beach, CA 92660

National Affordable
Communities, Inc
Attn: Christine Hanna
2020 Main Street, Suite 300
Irvine, CA 92614

State of California
Employment Development Dpt
Bankruptcy Group MIC 92E
PO Box 826880
Sacramento, CA 94280-0001

**20 LARGEST**
Studio Six5, Inc.
Attn: Corporate Officer
811 Barton Springs Rd Ste 800
Austin, TX 78704

273358

| 1 | U.S. Securities and Exchange Commis<br>Attn:  Bankruptcy Counsel<br>444 South Flower Street, Suite 900<br>Los Angeles, CA 90071-9591 | **20 LARGEST**<br>County of Ventura<br>Treasurer Tax Collector<br>800 S. Victoria Ave<br>Ventura, CA 93009 | **20 LARGEST**<br>Vortex Industries, Inc.<br>Attn: Corporate Officer<br>320 Irving Dr.<br>Oxnard, CA 93030 |

**SECURED**
WO PACE Funding, LLC  Series 2023
c/o White Oak Global Advisors, LLC
Attn: Corporate Officer
3 Embarcadero Center, Floor 5
San Francisco. CA 94111

**SECURED**
WO Pace Funding, LLC
Attn: California Statewide Comm.
Development Authority
1700 North Broadway, Suite 405
Walnut Creek, CA 94596

Internal Revenue Service
PO Box 7346
Philadelphia, PA9101-7346

**SECURED**
White Oak Global Advisors, LLC
Attn: Corporate Officer
3 Embarcadero Center, Suite 550
San Francisco, CA 94111

**NEF [36]**
Allen Matkins Leck Gamble
Mallory & Natsis LLP
Attn: Matthew D. Pham
865 S. Figueroa Street, Suite 2800
Los Angeles, California 90017-2543

**NEF RSN [35]**
Allen Matkins Leck Gamble
Mallory & Natsis LLP
Attn: Debra A. Riley
One America Plaza
600 West Broadway, 27th Floor
San Diego. California 92101-0903

**NEF RSN [35]**
CSCDA
c/o White Oak Global Advisors
Attn: Jeff Habicht
3 Embarcadero Center, Suite 550
San Francisco, CA 94111

273358